UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY BRADLEY #233422,

    Plaintiff,                                                Hon. Sally J. Berens

v.                                                               Case No. 1:21-cv-741

SCOTT YOKOM, et al.,

    Defendants.
_____/

**OPINION**

Plaintiff, a prisoner currently incarcerated with the Michigan Department of Corrections (MDOC) at the Kinross Correctional Facility, filed his complaint in this action on August 25, 2021 pursuant to 42 U.S.C. § 1983 alleging that Defendants Warden Dewayne Burton and Deputy Warden Scott Yokom retaliated against him in violation of the First Amendment while he was incarcerated at the Richard A. Handlon Correctional Facility (MTU). In particular, he alleged that Defendant Yokom retaliated against him by removing him from the Calvin Prison Initiative (CPI) program at MTU and transferring him to another facility and that Defendant Burton failed to respond to his kites about Yokom's treatment and retaliatory acts. After reviewing the complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c), the Court dismissed Plaintiff's claim against Defendant Burton but allowed his claim against Defendant Yokom to proceed. (ECF Nos. 11 and 12.)

Presently before the Court is Defendant Yokom's Motion for Summary Judgment. (ECF No. 39.) The motion is fully briefed and ready for decision. For the reasons that follow, the Court will **GRANT** the motion and dismiss Plaintiff's complaint with prejudice.[1]

## I. Background

The CPI program is a partnership between Calvin University and the MDOC that is based at MTU. The program allows prisoners who complete all the requirements to earn a tuition-free Bachelor of Arts degree from Calvin University in ministry leadership. (ECF No. 40-4 at PageID.263.) Because admission is very selective, only about 20 prisoners are accepted into the program each year. Students who participate in the program are expected to abide by the MDOC's policies as well as CPI's separate student code of conduct, which provides that, in the event a CPI student receives prison discipline, is the subject of an incident report, or receives a misconduct ticket, the program administrator will review the prisoner's student status. (*Id.*) Because CPI is a moral leadership program, honesty is expected regardless of potential negative consequences. (*Id.*)

In May 2018, Plaintiff was selected for admission to the CPI program. (ECF No. 1-4.) In June 2018, Plaintiff was transferred from Chippewa Correctional Facility, where he was incarcerated at the time, to MTU to begin the program. (ECF No. 1 at PageID.14.) As part of the transfer, the MDOC's Central Office placed a hold on Plaintiff's facility assignment preventing a transfer and allowing Plaintiff to remain at MTU until he completed the program. (ECF No. 1 at PageID.8; ECF No. 1-2.)

Plaintiff was serving a life sentence and became a member of MTU's chapter of the National Lifers Association (NLA). Plaintiff was interested in criminal justice reform and began

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the Court conducting all proceedings in this case, including entry of a final judgment and all post-judgment matters.

to correspond with Amani Sawari, an individual engaged in promoting various criminal justice reform initiatives outside of prison. (ECF No. 40-2 at PageID.242.) In her initial letter to Plaintiff, Sawari shared her idea for a ballot proposal to restore good-time credits in Michigan. (*Id.* at PageID.243.) Plaintiff wrote back to Sawari indicating his support for the ballot initiative and suggesting the idea of a rally at the capitol to promote the proposal. (*Id.* at PageID.243.) In August 2018, Sawari wrote to Plaintiff expressing interest in Plaintiff's idea for a rally at the capitol and soliciting his assistance in promoting her online petition for the good-time credit ballot initiative. (ECF No. 45-3.) Sawari also mentioned a planned national prison strike. (*Id.* at PageID.331.) She had apparently enclosed a newsletter about the prison strike, but Plaintiff never received it because it was rejected by mailroom staff. (*Id.*; ECF No. 40-2 at PageID.243.)

Plaintiff decided to assist Sawari in promoting the online goodtime petition on Sawari's website and approached the NLA leadership about supporting the petition. (*Id.* at PageID.244.) The NLA agreed to promote the online petition, and a member of the organization prepared a memorandum or flier that included the address for Sawari's website, which Plaintiff had provided. (*Id.*) The NLA submitted the flier to Ms. Ortiz, the Special Activities Director, for approval to post the flier in the housing units. In the course of reviewing Sawari's website, Ms. Ortiz discovered that it also contained information about a national prison strike. (*Id.* at PageID.244–45.) On or about August 20, 2018, Ms. Ortiz forwarded the flier to Defendant Yokom, who visited Sawari's website and found that it included information for a planned national prison strike that was to occur between August 21, 2018, and September 9, 2019. (ECF No. 40-3 at PageID.258.; ECF No. 45-7 at PageID.339.) Yokom's investigation led back to Plaintiff after he learned that Plaintiff had provided the website address to the NLA. Prison staff searched Plaintiff's cell and found Sawari's letter to Plaintiff mentioning the national prison strike and asking him to circulate her website.

3

(ECF No. 40-2 at PageID.246; ECF No. 40-3 at PageID.258.) Based on this information, Yokom concluded that Plaintiff knew the website contained information regarding the planned strike and sought to disseminate the information via the NLA. (ECF No. 45-7 at PageID.339.) Plaintiff was then taken to temporary segregation and issued a misconduct ticket the following day for inciting a strike or riot. (ECF No. 1-7; ECF No. 40-2 at PageID.246; ECF No. 40-3 at PageID.258.)

Plaintiff claims that he sent a kite to the warden on or about August 24, 2018, in which he asserted that Yokom and Captain Pettit, who investigated the matter, had falsely represented Plaintiff's conduct and the contents of Sawari's letter. (ECF No. 1 at PageID.5–6.) On August 27, 2018, Plaintiff had an initial administrative hearing on the misconduct charge. During the hearing, Plaintiff told the hearing officer that he had only been corresponding with Sawari about promoting the criminal justice reform rally and the good-time petition and stated that he was unaware of the information in the letter about the strike. Plaintiff said that Sawari had never asked him to help promote a prison strike and questioned whether the letter had been modified to add the information about the strike. (ECF No. 1-8 at PageID.32; ECF No. 40-2 at PageID.248–49.) Based on Plaintiff's request for the original letter, the hearing officer adjourned the hearing to allow the charging officer to provide the original letter. (ECF No. 1-8 at PageID.31–32.)

Although Yokom denies the allegation (ECF No. 40-3 at PageID.259), Plaintiff alleges that on August 28, 2018, Yokom came to his cell and, apparently referring to Plaintiff's August 24, 2018 kite to the warden, said, "Oh you want to write the warden and complain about me and my officer[?]" (ECF No. 1 at PageID.6.) Plaintiff responded, "Yes," and said that he planned on writing a grievance. Plaintiff alleges that he told Yokom he did nothing wrong and came to MTU to go to college, not to promote a strike. (*Id.*) Plaintiff claims that Yokom responded, "You can forget college, that's over with." (*Id.*) Plaintiff alleges that, when he told Yokom that he would not

4

be removed from the CPI program if he was found not guilty on the misconduct ticket, Yokom responded that he did not care about the outcome because he would be transferring Plaintiff out of MTU. Plaintiff also asserts that he threatened to file a grievance and a civil lawsuit against Yokom. (*Id.*) On August 31, 2018, following the reconvened hearing, the hearing officer dismissed the misconduct charge due to Captain Pettit's apparent failure to timely provide the original Sawari letter. (ECF No. 1-8 at PageID.31.)

On August 31, 2018, Plaintiff returned to his CPI courses. He alleges that Co-Director Dr. Christina de Groot welcomed him back and told him that, because the misconduct charge had been dismissed, Plaintiff's placement in the program was not in jeopardy. (ECF No. 1 at PageID.8.) Later that day, however, Yokom met with Dr. Todd Cioffi, the other CPI Co-Director, regarding the misconduct report and the related investigation. Upon receipt of this information, Dr. Cioffi expressed concern about whether Plaintiff had violated the CPI code of conduct. (ECF No. 40-3 at PageID.259; ECF No. 40-4 at PageID.264.) Specifically, Dr. Cioffi was concerned about whether Plaintiff had been honest during the investigation and hearing on the misconduct ticket. (*Id.*) After a short time, Plaintiff joined the meeting and saw that Yokom had the misconduct report in front of him, as well as the original letter from Sawari. (ECF No. 40-2 at 252.) Plaintiff alleges that, during the meeting, Yokom told Dr. Cioffi that Plaintiff had lied about Sawari and her website. Plaintiff alleges that he refuted those allegations, but Dr. Cioffi said that he believed that Yokom had demonstrated that Plaintiff had lied to the hearing officer about the letter during the misconduct hearing. (ECF No. 1 at PageID.8–9.) Dr. Cioffi determined that Plaintiff had not been forthcoming about his involvement with Sawari during the investigation and misconduct hearing and, therefore, had violated the code of conduct. (ECF No. 40-2 at PageID.252; ECF No. 40-4 at

PageID.264.) Accordingly, Dr. Cioffi informed Plaintiff that he believed Plaintiff should not continue in the CPI program. (*Id.*)

Plaintiff was terminated from the CPI program and moved to a non-CPI program unit within MTU. On September 13, 2018, in accordance with established procedure for prisoners who had been dismissed from the CPI program, Plaintiff was transferred from MTU to a different facility. (ECF No. 40-3 at PageID.260; ECF No. 40-5.)

## II. Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Discussion

### A. Objections to Hearsay

In response to Defendant Yokom's motion, Plaintiff has offered several declarations from other prisoners, including Tyrone Slusser and Tunc Uraz. (ECF No. 45-2 at PageID.320–21, 323–24.) Yokom argues that at least some portions of these declarations contain hearsay and thus should not be considered in resolving the instant motion. In particular, Yokom contends that Slusser's statements concerning his September 2018 and June 2022 conversations with Dr. Cioffi regarding the reasons for Plaintiff's dismissal from the CPI program are hearsay. Yokom also contends that

6

prisoner Uraz's statements concerning his transfer and another prisoner's transfer from MTU constitute hearsay.

Rule 801 of the Federal Rules of Evidence defines "hearsay" as "a statement that . . . the declarant does not make while testifying at the current trial or hearing . . . [which] a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). In deciding a motion for summary judgment, a court may not consider hearsay. *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012); *see also Cody through Szabo v. Kenton Cnty. Pub. Schs.*, No. 2:20-CV-103, 2023 WL 1952791, at *9 (E.D. Ky. Feb. 10, 2023) ("Because any statements other people made to the Szabos about the scrimmage are inadmissible hearsay, the Court may not consider that incident in the context of a motion for summary judgment.").

Here, the statements Slusser makes in his declaration about what Dr. Cioffi—a non-party—told him meet the definition of hearsay to the extent Plaintiff offers them to prove the truth of the matters asserted, i.e., the reason Dr. Cioffi dismissed Plaintiff from the program and Dr. Cioffi's statements to a Co-Director of the Hope-Western Prison Education Program in connection with Plaintiff's application to that program. Similarly, Uraz's statements regarding what he was told about the reason for his own transfer and what another prisoner, Jenero Osborne, told Uraz about his transfer, constitute inadmissible hearsay. Accordingly, the Court will not consider those statements in the Slusser and Uraz declarations.

**B.  Retaliation Claim**

Plaintiff alleges that Yokom retaliated against him for his complaint to the warden and threats to file a grievance and lawsuit against Yokom. To establish his claim, Plaintiff must prove the following elements: (1) he engaged in protected conduct; (2) the defendant took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the adverse action was taken (at least in part) because of the protected

conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). To satisfy the causal connection requirement, the plaintiff must show that the defendant's retaliatory motive was "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). Even where the plaintiff establishes a prima facie case, "[i]f the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399.

Yokom contends that Plaintiff's retaliation claims fail for several reasons. First, as to the dismissal from the CPI program, while Yokom concedes that Plaintiff can establish the first two elements of his claim, Yokom contends that Plaintiff fails to establish the requisite causal connection. Yokom further contends that he had a non-retaliatory basis for informing Dr. Cioffi about Plaintiff's conduct subject to the misconduct ticket—that Plaintiff had violated the CPI student code of at the misconduct hearing by representing to the hearing officer that Sawari's letter did not mention the national prison strike. Second, as for the retaliatory transfer claim, Yokom argues that the transfer did not amount to adverse action because the transfer did not result in foreseeable negative consequences to Plaintiff.

### 1. Removal from the CPI Program

To establish his prima facie case, Plaintiff must present sufficient evidence to show that Yokom acted with retaliatory motive. *Thaddeus-X*, 175 F.3d at 386. A defendant who initiates the chain of events that leads to an adverse action may be held liable "even if the harm is executed by someone else." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (citing *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007) ("Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable.")). Thus, Yokom may be held liable

for Plaintiff's removal from the CPI program even if Dr. Cioffi (or Dr. Cioffi and Dr. de Groot jointly), rather than Yokom, made the decision to remove Plaintiff from the program. The issue, however, is one of motive. As the Sixth Circuit observed in *King*, the defendant's subjective motivation matters "because our concern is with actions by public officials taken with the intent to deter the rights to free expression guaranteed under the First Amendment." 680 F.3d at 695.

To establish Yokom's retaliatory motive, Plaintiff points to Yokom's alleged statement to Plaintiff during their August 28, 2018 exchange at Plaintiff's segregation cell that, "Oh you want to write the warden and complain about me and my officer[?]" Plaintiff also notes that during this exchange he threatened to file a grievance and a civil lawsuit against Yokom, that he and Yokom argued about whether Plaintiff could be removed from the CPI program even if he was found not guilty on the misconduct ticket for inciting a riot, and that Yokom said that, regardless of the outcome, he would transfer Plaintiff out of MTU. (ECF No. 45 at PageID.303–04.) Plaintiff's own evidence shows, however, that by August 20, 2018—before Plaintiff had engaged in *any* protected conduct—Yokom had concluded, based on his interviews of Plaintiff and other prisoner witnesses and his review of Sawari's letter and her website, that Plaintiff "knew the website contained information regarding the Prisoner Strike and [he] tried to disseminate the information via the NLA." (ECF No. 45-7 at PageID.339.) Thus, in spite of Yokom's alleged statement recognizing Plaintiff's protected conduct and Plaintiff's threats to file a grievance and a civil lawsuit, Yokom's statements regarding removal from the program and transfer out of MTU regardless of the outcome were clearly based on his preexisting conclusion that Plaintiff had, in fact, been aware of the strike from Sawari's letter and intended to promote a strike. Plaintiff's version of events confirms this conclusion; Plaintiff does not allege that Yokom made any statement tying removal/transfer regardless of the outcome of the hearing to Plaintiff's actual or threatened protected conduct.

9

In any event, while it is not clear when Yokom received the copy of the misconduct hearing report, it is clear that he had received it prior to the August 31, 2018 meeting with Dr. Cioffi and that the hearing report reflected that Plaintiff had denied any knowledge that Sawari's letter mentioned a prison strike and had suggested that someone else may have added that part to the letter. (ECF No. 1-8 at PageID.31.) As noted, prior to this time, Yokom had seen the letter and was aware of its contents, and Plaintiff conceded in his deposition that he told the hearing officer that the letter said nothing about a strike, which was false. (ECF No. 40-2 at PageID.243, 248–49.) Furthermore, Plaintiff admits that the meeting with Yokom and Cioffi focused on Plaintiff's lack of truthfulness with the hearing officer about the contents of the letter. (*Id.* at PageID.252.) In short, Plaintiff fails to present evidence creating a genuine issue of fact that Yokom acted out of retaliatory animus in notifying Dr. Cioffi of Plaintiff's statements to the hearing officer. Plaintiff's evidence—Yokom's mere acknowledgment of Plaintiff's complaint to the warden—is simply speculative in nature and cannot defeat Yokom's properly supported motion. *See Jennings v. County of Monroe*, 630 F. App'x 547, 555 (6th Cir. 2015) ("A party cannot defeat summary judgment with 'conclusory allegations, speculation, and unsubstantiated assertions.'" (quoting *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 894 (6th Cir. 2003)).

Plaintiff also fails to rebut Yokom's non-retaliatory basis for his actions. Yokom states that he met with Dr. Cioffi regarding Plaintiff, as he would have done for any other prisoner enrolled in the CPI program who had received a misconduct. (ECF No. 40-3 at PageID.259.) Although the misconduct report had been dismissed, the dismissal was based solely on Captain Pettit's failure to provide the original Sawari letter to the hearing officer rather than her finding that Plaintiff did not actually intend to promote a prison strike. Given Yokom's knowledge of the letter's contents and Plaintiff's statements to the hearing officer, Yokom had a reasonable basis to conclude that

10

Plaintiff had been untruthful in the misconduct hearing and that Dr. Cioffi should be informed of Plaintiff's conduct.

Plaintiff argues that, absent Yokom's influence on Dr. Cioffi, there was no evidence to support Plaintiff's dismissal from the CPI program. Plaintiff further contends that Yokom's conduct violated MDOC Policy Directive 03.03.105(GG), which provides that "[i]f the prisoner is found not guilty or the charges are dismissed, the Misconduct Report and the Class I Misconduct Hearing Report shall not be filed in any of the prisoner's files or used against the prisoner." (ECF No. 45 at PageID.304–05.) These arguments fail to defeat Yokom's motion. First, even if Yokom violated an MDOC policy, it is well established that Section 1983 does not provide redress for a violation of prison policies. *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). In addition, even if Yokom violated MDOC policy by sharing the information with Dr. Cioffi, that violation, in and of itself, does not show that Yokom acted with retaliatory motive, nor does it defeat his asserted non-retaliatory basis for his action. The ultimate issue here is not whether Yokom influenced Dr. Cioffi's decision or whether Yokom unfairly or mistakenly determined that Plaintiff had lied to the hearing officer, even though Plaintiff concedes that the letter in fact mentions the prison strike and that Yokom knew that Plaintiff had read the letter, yet asserted to the hearing officer without foundation that the prison strike portion had been added by some unknown third party. Nor is the issue whether Plaintiff was "stress[ed]" at the hearing (ECF No. 40-2 at PageID.249) and innocently forgot about or denied that the letter mentioned a strike. Rather, the material issue is whether Yokom provided Dr. Cioffi the letter and misconduct report with an intent to retaliate against Plaintiff for engaging in protected conduct. Because Plaintiff fails to provide evidence of that alleged fact, Yokom is entitled to summary judgment on the retaliatory-dismissal claim.

### 2. Retaliatory Transfer Claim

Yokom argues that Plaintiff's retaliatory transfer claim fails because Plaintiff cannot show negative foreseeable consequences from a transfer from one level II facility to another level II facility. Apart from adverse action, however, Plaintiff cannot show that Yokom acted with a retaliatory motive in transferring Plaintiff to a different facility. In this regard, Plaintiff's own evidence demonstrates that Yokom did not transfer Plaintiff due to his protected conduct. In particular, Plaintiff offers a declaration from Larry Carr, who states that during the fall of 2018, after Plaintiff was transferred from MTU, he overheard Yokom state, "Bradley thought he was going to remain at this facility after trying to promote a strike. I told Cioffi that Bradley had to go. And after Cioffi kicked him out of (CPI), I transferred Bradley's ass out of here on the first bus smoking." (ECF No. 45-2 at PageID.322.) Carr's declaration clearly shows that Yokom transferred Plaintiff not because of Plaintiff's protected conduct, but because he believed Plaintiff sought to promote a strike. Even if Yokom was mistaken or reached an unfair conclusion about Plaintiff's intent to promote a strike, his conduct did not violate the First Amendment.[2]

---

[2] Although the Court need not address the argument, it finds Yokom's non-adverse action argument persuasive. It is well established that a transfer from one prison facility to another is generally insufficient to constitute adverse action for purposes of a retaliation claim. *See LaFountain v. Harry*, 716 F.3d 944, 948 (6th Cir. 2013) ("As a general matter, a prison official's decision to transfer a prisoner from the general population of one prison to the general population of another is not considered adverse.") (citing *Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir. 2003)). In order for a transfer to constitute adverse action, the transfer must result in "foreseeable consequences" that would deter the protected conduct. *Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005). For example, the Sixth Circuit has found that a transfer can constitute adverse action where it hinders the prisoner's access to the courts. *Id.* (noting that as a result of the transfer, the plaintiff not only lost his high paying job that he needed to pay his attorney, but also made consultation more difficult by moving the plaintiff further away from the attorney). Similarly, an increased security level might render a transfer adverse. *King v. Zamiara*, 150 F. App'x 485, 493 (6th Cir. 2005). Although Plaintiff contends that the transfer has precluded his subsequent acceptance into other prison college programs, he fails to present admissible evidence that that is the case. In addition, although the Court denied Plaintiff's motion to file a reply, the evidence he sought to present is hearsay and, at best, shows that he was denied admission to the program not

## IV.  Conclusion

For the reasons set forth above, the Court will **grant** Yokom's Motion for Summary Judgment (ECF No. 39) and dismiss Plaintiff's complaint with prejudice.

A separate Order consistent with this Opinion will be entered.

Dated: May 29, 2024                   /s/ Sally J. Berens
                                      SALLY J. BERENS
                                      U.S. Magistrate Judge

---

due to the transfer out of MTU, but because of "behavior issues from being dismissed from Calvin College (C.P.I.)." (ECF No. 54 at PageID.406.)